# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| DAVID BLEEKE, MELISSA BLEEKE, | ) | |
| K.B. (minor child), and Z.B. (minor child), | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | NO. 1:09-CV-228 PPS APR |
| | ) | |
| GREGORY SERVER, Individually and as a | ) | |
| Member and Chairman of the Indiana Parole | ) | |
| Board; RANDALL P. GENTRY, | ) | |
| Individually and as a Member and Vice | ) | |
| Chairman of the Indiana Parole Board; | ) | |
| THOR R. MILLER, Individually and as a | ) | |
| Member of the Indiana Parole Board; | ) | |
| VALERIE J. PARKER, Individually and as | ) | |
| a Member of the Indiana Parole Board; | ) | |
| WILLIAM R. HARRIS, Individually and as | ) | |
| a Member of the Indiana Parole Board; MIA | ) | |
| KELSAW, Individually and as a Parole | ) | |
| Supervisor for the Indiana Parole Board, Ft. | ) | |
| Wayne District 2; DAMITA | ) | |
| VANLANDINGHAM, Individually and as a | ) | |
| Parole Supervisor for the Indiana Parole | ) | |
| Board Fort Wayne District 2, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## OPINION ORDER

David Bleeke can have no contact with his two children. He can't see them, can't talk

with them on the telephone and he can't even have a picture of them. Bleeke finds himself in

this position because he is a sex offender, and under Indiana parole guidelines, sex offenders –

even those who have had no untoward contact with children – are banned from being near

1

children, including their own.  If Bleeke attempts to see his kids, he risks having his parole

revoked and being sent back to prison.  David Bleeke, his wife Melissa, and their children have

brought this action seeking to have the parole conditions declared unconstitutional, along with

injunctive relief and money damages.  Defendants include members of the parole board and

David's past and present parole agents, who have implemented and enforced these conditions.

David and Melissa also seek a preliminary injunction [DE 6] asking me to enjoin the

enforcement of these conditions or at the very least require the Defendants to give him a due

process hearing to assess whether David is a risk to his children.   On November 20, 2009, I held

a hearing on the motion for a preliminary injunction and evidence was taken.

Defendants move to dismiss the complaint [DE 16] principally arguing that this case should

have been brought as a habeas corpus petition, not under § 1983.  For the reasons detailed below,

both the motion for preliminary injunction and the motion to dismiss are granted in part and

denied in part.  All of the Bleekes' claims are dismissed except for the procedural due process

claim. For that claim, the Bleekes have established an entitlement to a preliminary injunction.

The parties are therefore ordered to file proposed procedural measures consistent with the

constitutional requirements discussed in this opinion.

**FINDINGS OF FACT**

David Bleeke was convicted by a jury of attempted criminal deviate conduct, sexual

battery and residential entry on January 31, 2005.  (D. Bleeke Aff. [DE 6-2], ¶ 5.)  The

conviction related to an event that occurred in July 2002 and involved an adult female who was

over the age of 21. (*Id*.).  David was sentenced to 10 years in the Indiana Department of

Corrections. (Def.'s Br. Opp. to Prelim. Inj. [DE 22] at 2; (D. Bleeke Aff. [DE 6-2], ¶ 7). To this

day, David proclaims his innocence and states that he was wrongfully convicted based on a faulty identification. (For the sake of clarity, David and Melissa Bleeke are referred to in this order by their first names.) David has never been convicted, charged, or accused of any offense against children. (*Id.*, ¶ 6).

After serving a little more than three years in prison, David was released to a "community transition program" on March 19, 2008. He was then released on parole on April 24, 2009. (*Id.*, ¶¶ 9, 10). Since his release into the community transition program in March 2008, he has been subject to the parole conditions listed on State Form 49108 entitled "Parole Stipulations for Sex Offenders." (*Id.*, ¶ 12; Parole Stipulations [DE 6-2, Ex. 1]). The same conditions apply to all sex offenders, regardless of whether they were convicted for crimes against adults or crimes against children. Parole condition # 4 states:

> You shall not touch, photograph (still or moving), correspond with (via letter or email) and/or engage in "small talk" or unnecessary conversation with any child, ***including your own***, either directly or via third part, or attempt to do any of the preceding without written approval in advance by your parole agent in consultation with your treatment provider. You must never be in any vehicle or any residence with any child, ***including your own***, even if other adult(s) is/are present, without written approval in advance by your parole agent in consultation with your treatment provider. You must report any inadvertent contact with children to your parole agent with twenty-four (24) hours of contact. (*Id.*, ¶ 4)(emphasis added).

Another condition requires David to complete a court-approved sex offender intervention and treatment program. (*Id.*, ¶ 1). Though he entered the Family & Children Services program in Fort Wayne, Indiana, he was told that he could not complete it if he continued to protest his innocence of the crime for which he was convicted. (Report on David Bleeke [DE 6-2, Ex. 3]). The program therapist states that David was told he could "consider" the option of taking an instant offense polygraph which asks him questions about his criminal conviction. But it is

unclear what effect this would have on his ability to complete the program if he continues to deny his offense. (*Id.*)  David testified that he has never refused or declined to submit to a polygraph test, and in fact, took a "maintenance" polygraph at his own expense which is a polygraph that focuses on the parolee's compliance with his parole conditions.

David and Melissa were married prior to his conviction. (D. Bleeke. Aff. [DE 6-2], ¶ 3). Their son, K.B., was conceived while David was awaiting trial and was born on May 3, 2005, while David was in prison.  (*Id.*, ¶ 15).  Nevertheless, father and son developed a close relationship thanks to regular visits made by Melissa and K.B. while David was in prison.  (*Id.*, ¶ 16).  Melissa and David had another son, Z. B., born after David's release from prison, on July 7, 2009. (*Id.*, ¶ 18).  Since his release, David has had to maintain a separate residence from the rest of the family because his parole conditions prohibit him from living with children, even his own. (*Id.*, ¶ 24).

David made a request of his parole officer to be present for the birth of Z.B. but that request was denied because of the condition prohibiting contact with the children.  The condition also includes a prohibition on talking on the phone with the children.  So when David is talking with Melissa on the phone and the children are nearby and want to speak to him, he has to hang up on them or risk noncompliance with the parole conditions.  As a result of the parole conditions, David has not seen or communicated with either of his children since leaving prison. (*Id.*, ¶¶ 17-20).  David is also prohibited from having photographs or videotapes of his children. (*Id.*)  One exception to the photo restriction has been made; David now has a single photograph of his newborn, Z.B.

The complaint asserts claims under 42 U.S.C. § 1983 brought not just by David, but by Melissa and the children as well. The Bleekes allege that the parole conditions impinge on their constitutional rights to: 1) Substantive Due Process; 2) Equal Protection; 3) Procedural Due Process; 4) Association as a fundamental right under the First and Fourteenth Amendments; and 5) Free Speech and Protection Against Self-Incrimination.

## DISCUSSION

A party seeking a preliminary injunction must demonstrate 1) a likelihood of success on the merits; 2) a lack of an adequate remedy at law; and 3) that an irreparable harm will result if the injunction is not granted prior to the resolution of the claims. *See Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of America, Inc.*, 549 F.3d 1079 (7th Cir. 2008). The granting of a preliminary injunction is an extraordinary remedy. *Winter v. Natural Res. Def. Council,* 129 S.Ct. 365, 376-77 (2008). So even if the first three elements are established, I must balance the relative harms that could be caused to either party. *Id.* This is done on a sliding scale so that a lesser likelihood of success can be overcome with proof that the balance of harms tips strongly in the plaintiff's favor. *See AM Gen. Corp. v. DaimlerChrysler Corp.,* 311 F.3d 796, 804 (7th Cir.2002).

Of the three requirements necessary to support a preliminary injunction, the Defendants only argue that there is no likelihood of success on the merits. If the state has been violating the Bleekes' constitutional rights and improperly kept David from his children, it goes almost without saying that the harm is irreparable and could not be remedied through other means such as money damages. So if the Bleekes are likely to succeed on the merits, then preliminary relief

would be justified. As a result, the discussion below only addresses the likelihood of success issue. I will first address the substantive claims and then take up the procedural claims.

## I.     The Substantive Claims

Defendants argue that the Bleekes' claims cannot be brought via § 1983, but instead may only be addressed through the filing of a habeas corpus petition. If the Defendants are correct, then obviously the Bleekes cannot show a likelihood of success and their motion for preliminary injunction would fail.

A prisoner cannot challenge "the fact or duration of his confinement" through a § 1983 action. *Preiser v. Rodriguez*, 411 U.S. 475, 489 (1973). Although such claims are covered by the literal language of both § 1983 and the habeas statute, the latter is more specific and has been traditionally utilized as the "instrument to obtain relief from [unlawful] confinement." *Wilkinson v. Dotson*, 544 U.S. 74, 78-79 (2005)(quoting *Preiser*, 411 U.S. at 486). So the Supreme Court treats § 1983 as having an implicit exception for actions that lie "within the core of habeas corpus." *Id*. at 487. This means that prisoners may not use § 1983 to seek "immediate release from prison" or the "shortening [of] the length of their confinement." *Id*. at 482.

The distinction between § 1983 and habeas was explained in *Heck v. Humphrey*, 512 U.S. 477 (1994), where a state prisoner brought a § 1983 action for damages, claiming officials had unconstitutionally caused his conviction by destroying evidence. *Id*. at 479. The Court held that where "establishing the basis for the damages claim necessarily demonstrates the invalidity of the conviction," the prisoner is precluded from bringing the § 1983 claim unless "the conviction or sentence has already been invalidated." *Id*. at 481-82, 487.

More recently, in *Wilkinson,* the Supreme Court focused on the § 1983 versus habeas distinction in the parole context. There, two prisoners brought § 1983 claims seeking to invalidate state procedures used to deny their parole eligibility and suitability. *Wilkinson*, 544 U.S. at 82. The Court noted that the claims only attacked procedural measures and reasoned that success for the plaintiffs meant, at most, new eligibility reviews or parole hearings. *Id*. "Because neither prisoner's claim would necessarily spell speedier release, neither lies at 'the core of habeas corpus.'" *Id*. (quoting *Preiser*, 411 U.S. at 489); *see also Wolff v. McDonnell*, 418 U.S. 539, 555 (1974) (although a prisoner could not use § 1983 to obtain the restoration of good-time credits, it could use § 1983 to attack the disciplinary *procedures* which led to his loss of credits).

A couple of years *before* the Supreme Court issued its opinion in *Wilkinson*, the Seventh Circuit addressed a parolee's § 1983 challenge to his parole condition which prohibited him from traveling to foreign countries. *Williams v. Wisconsin*, 336 F.3d 576, 578-59 (7th Cir. 2003). The Court held that Williams was barred from bringing the challenge through § 1983 and could only rightfully present it as a habeas claim. *Id*. at 580. This was because "[f]or parolees . . . the 'conditions' of parole *are* the confinement." *Id*. at 579 (emphasis in original). So if the plaintiff were to prevail, "figuratively speaking, one of the 'bars' would be removed from [his] cell." *Id*. at 580 (quoting *Drollinger v. Milligan*, 552 F.2d 1220, 1225 (7th Cir. 1977)).

The Bleekes argue that *Wilkinson* effectively overruled this portion of *Williams* and *Drollinger* and authorizes them to bring a § 1983 suit directly attacking David's parole conditions. Not so. *Wilkinson* in no way addressed parole conditions, but rather the procedures in place to determine parole eligibility. The *Wilkinson* plaintiffs were not even on parole yet, so they did not have any conditions to challenge. Success for the *Wilkinson* plaintiffs merely meant

a new parole eligibility review – not necessarily a shorter stint in prison. So I cannot say that the logic of *Williams* has been undermined by *Wilkinson*.[1] And since I find that *Williams* and *Drollinger* still bind me, all of David's claims directly attacking his parole conditions must be dismissed.

The same collection of cases leads me to the conclusion that the substantive, non-procedural claims brought by Melissa and the children must be dismissed as well. The crux of *Heck* was that a civil rights claim is not cognizable under § 1983 if prevailing on that claim necessarily implies the invalidity of the "conviction or sentence." *Heck*, 512 U.S. at 481-82, 486-87. That is precisely what Melissa and the Bleeke children are trying to do with their substantive challenges to David's parole conditions. In practical terms, there is no way for Melissa and the children to obtain any relief on their substantive claims, i.e. getting David to live with them, without rendering his parole condition a nullity. If this were a straightforward prisoner claim challenging a loss of good-time credits, an inmate could not simply make a head fake around *Heck* by passing off his claim to his wife. Success on that claim could only occur by demonstrating the invalidity of the disciplinary ruling. For the same reason, and given that *Williams* demands that I treat David's parole conditions as part of his sentence, his wife and children's claims cannot be brought under § 1983.

Language from the *Heck* opinion itself supports this conclusion. *Heck* said that "in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm

_____

[1] Indeed, in *Savickas v. Walker*, 180 Fed.Appx. 592 (7th Cir. 2006), an unpublished opinion but nevertheless one which came out after *Wilkinson*, the Seventh Circuit applied both *Williams* and *Drollinger* in determining that a parolee could not bring a § 1983 suit challenging the supervised release condition placing him under electronic detention.

caused by actions whose unlawfulness would render a conviction or sentence invalid, *a § 1983 plaintiff* must prove that the conviction or sentence has been" set aside. *Id*. at 486-87 (emphasis added). The *Heck* opinion applies, by its terms, to "a § 1983 plaintiff." There is no limitation to "prisoners" or "inmates." I see no reason why the same principles of comity which led to the judicially created exception to § 1983's scope discussed in *Heck* should not apply to family members in the same manner that it does to prisoners themselves. Since Melissa and the children are "§ 1983 plaintiffs" seeking to invalidate a part of David's sentence, they are also prevented from doing so by *Heck*.

## II.    Procedural Claims

While dismissal of the Bleekes' substantive claims is warranted, the procedural due process claims under § 1983 survives. Where success on a § 1983 claim means, at best, new parole proceedings that do "not necessarily vitiate the legality" of convictions or sentences, then the claim is not displaced by habeas relief. *Wilkinson*, 544 U.S. at 81. So long as the parole proceedings give the authorities the discretion to leave the status unchanged, the action can be brought under § 1983. *Id*. at 82; *see also Grennier v. Frank*, 453 F.3d 442, 444 (7th Cir. 2006); *Moran v. Sondalle*, 218 F.3d 647, 652 (7th Cir. 2000). For example, in *Bartley v. Wisconsin Dept. of Corrections*, 258 Fed.Appx. 1, 2 (7th Cir. Dec. 6, 2007), the Seventh Circuit held that § 1983 was the appropriate vehicle to challenge Wisconsin's parole procedures which prevented the plaintiff from completing a sex offender treatment program and consequently achieving parole eligibility because success in the § 1983 action would merely mean becoming eligible for a discretionary grant of parole. The Bleekes procedural due process claims similarly do not ask

for the immediate alteration of his parole conditions, but merely the creation of procedures enabling him to challenge those conditions.

Procedural due process claims require a two-step inquiry. First, I must determine whether the plaintiff has been deprived of a protected liberty interest. If he has, then I need to decide the process he is due. *Pro's Sports Bar & Grill, Inc. v. City of Country Club Hills*, __ F.3d __ , 2009 WL 4825193 (7th Cir.); *McMahon v. Kindlarksi*, 512 F.3d 983, 987-88 (7th Cir. 2008).

A number of years ago, the Seventh Circuit decided a case similar to the one presented here, *see Felce v. Fiedler*, 974 F.2d 1484 (7th Cir. 1992), and that case provides a framework for analyzing the issues presented here. In *Felce*, a Wisconsin prisoner challenged his parole committee's decision to condition his parole on the receipt of antipsychotic drug injections. *Id.* at 1486-88. *Felce* addressed the first step of the procedural due process inquiry by looking to *Turner v. Safley,* 482 U.S. 78, 89-91 (1987), a case that sets out how courts are to analyze the extent of the liberty interest where prison regulations impede on constitutional rights. *Felce*, 974 F.2d at 1494. For the second step, determining what process was due, the *Felce* court followed the test laid out in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

A.   *Liberty Interest*

In *Felce*, the Seventh Circuit held that a state creates a liberty interest in parole when it institutes a mandatory parole scheme, albeit one which may be limited in order to achieve the goals of parole. *Felce*, 974 F.2d at 1490 (citing *Morrissey v. Brewer,* 408 U.S. 471 (1972); *Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex,* 442 U.S. 1 (1978); *Board of Pardons v. Allen,* 482 U.S. 369 (1987)); *cf. Grennier v. Frank*, 453 F.3d 442 (7th Cir.

2006) (no liberty interest in parole when serving a life sentence). And once a person is released to parole, he has a liberty interest in remaining free from unwanted injections from antipsychotic drugs stemming from the Due Process Clause. *Id*. at 1489 (citing *Washington v. Harper* (494 U.S. 210, 221-22 (1990)). So *Felce* holds that there is a liberty interest both in state created mandatory parole regimes and in being free from antipsychotic drugs, though both rights are subject to qualification. *Id*. at 1494.

On the other side of the equation, in the parole context, the state has a competing interest in protecting the public since parolees have unsupervised contact with the community. *Id*. at 1495. But this interest is offset by the state's responsibilities to reintegrate parolees into society. *Id*. In weighing these competing interest, *Felce* ultimately concluded that "[b]efore the use of drugs can be made a condition of his continued parole, the state must demonstrate that such administration is medically indicated to accomplish the goals of the parole program reintegrating Mr. Felce into the community." *Id*.

In this case, I start by noting that, like the Wisconsin scheme at issue in *Felce*, Indiana creates a mandatory parole system, *see* Ind. Code § 35-50-6-1. So David has a liberty interest in his parole. And in the same manner that Mr. Felce had a conditional liberty interest in remaining free from antipsychotic drugs while on parole, David Bleeke has a constitutionally guaranteed liberty interest in familial association with his children. Generally speaking, "parents have a liberty interest, protected by the Constitution, in having a reasonable opportunity to develop close relations with their children." *Stojanovic v. Humphreys*, 309 Fed. Appx. 48, 51 (7th Cir. Feb. 5, 2009)(quoting *Hodgson v. Minnesota,* 497 U.S. 417, 484 (1990)) (Kennedy, J., concurring in part and dissenting in part)); *Lehr v. Robertson*, 463 U.S. 248, 261 (1983); *Russ v.*

*Watts*, 414 F.3d 783, 789 (7th Cir. 2005);   *Doe v. Heck*, 327 F.3d 492, 522 (7th Cir. 2003).   This liberty interest extends even to incarcerated inmates to protect the right of visitation with their children. *See Stojanovic*, 309 Fed. Appx. at 51 (finding that the prisoner had a protected liberty interest in visitation with his daughter).

The ability to be with one's family is part and parcel of the very purpose of parole and one of the most significant freedoms promised to and expected by prisoners working to achieve their parole release. As the Supreme Court has noted: "Subject to the conditions of his parole, [the parolee] can be gainfully employed and is free to be with family and friends and to form the other enduring attachments of normal life." *Morrissey,* 408 U.S. 471, 482 (1972).

While there is a constitutional liberty interest for a parolee to be with his children, it is not unlimited.  The state's penological interests have a role to play.  This includes the interest in keeping individuals safe from a parolee's potentially recidivist activities. *See United States v. Knights*, 534 U.S. 112, 120-21 (2001).  In the case of parolees convicted of sexual offenses, recidivism concerns are especially high. *See e.g., United States v. Rosenbohm*, 564 F.3d 820, 825 (7th Cir. 2009)(citing H.R.Rep. No. 107-373, at 3 (2002)).  But by the same token, the same state interest in reintegrating parolees into society exists for Indiana just as it did for Wisconsin in *Felce*. *See* Ind. Code § 11-13-3-4(b) (allowing Indiana parole board to place conditions on parole so long as they are "reasonably related to the parolee's successful reintegration into the community and not unduly restrictive of a fundamental right").

So in weighing these competing interests – David's interest in being with his children versus the state's interest in avoiding recidivism – as noted, *Felce* suggests that I consult the analysis the Supreme Court utilized in *Turner*.  Although *Turner* is a *substantive* due process

case, the *Felce* court nevertheless looked to it in determining the scope of the liberty interest in the context of a *procedural* due process claim. *Felce,* 974 F.2d at 1294. And although *Turner* involved prison regulations, not parole conditions, *Felce* found that the "analysis is just as applicable to parole as to prison situations." *Id.*

Turning to the first *Turner* factor – whether a rational connection exists between the regulation and the governmental interest advanced as its justification, *Turner*, 482 U.S. at 89-90 – the state in this case attempted to prove this through expert testimony. Defendant's expert, psychotherapist Adam Denning, testified as to the statistical tendencies of adult sex offenders. He focused his testimony on a study showing that 50 % to 70 % of repeat sex offenders could be considered "cross-over" offenders, reaching across category types including age and gender. According to Denning, perhaps counter-intuitively, adult sex offenders are more likely to be "cross-over" offenders than pedophiles and other sexual abusers of children. In other words, just because David was convicted of a sexual offense against an adult does not mean that concerns over recidivism should not include his targeting of children in the future. While this testimony shows that David's parole condition has some basis in rationality, the connection is far from overwhelming. For one thing, the findings cited by Denning were based on a study of only 500 individuals. More significantly, even assuming the study was completely reliable, it still leaves a sizeable number of adult sex offenders who would never look to children as targets of repeat misconduct, let alone their own children.

The second *Turner* factor, whether alternative means of exercising the right are available, weighs heavily against the Defendants. The parole condition is absolute. David is completely cut off from his children. He cannot talk to them on the phone; he cannot write them letters or

emails; he cannot talk to them via third parties. He can't even have pictures of them. These facts separate this case from cases like *Overton v. Bazzetta,* 539 U.S. 126, 135 (U.S. 2003) which upheld restrictions on prisoner visitations with minors. The regulation in *Overton,* which prohibited minor visitation, had an exception for "children, stepchildren, grandchildren, or siblings of the inmate." *Overton*, 539 U.S. at 129-30. In contrast, David's parole conditions prevent *all contact* with his own children.

The third *Turner* factor – what effect accommodating the exercise of the right would have on guards, other prisoners, and prison resources generally – also weighs in the Bleekes' favor. Obviously, David is not in prison, and so the use of prison guards and the expenditure of other prison resources will not be necessary to accommodate David's interest. As for the increased cost to the parole system of allowing David to have contact with his children, the costs appear to be minimal. David already has a parole team in place, and he does not challenge the parole stipulation requiring him to report to his parole agent on a weekly basis. *See* Parole Stipulations [DE 6-2], Ex. 1, ¶ 23. The necessary resources for reintegrating David into the community, and protecting the community from David, are therefore already allocated as part of his general parole conditions. Allowing him to visit his family would not seem to burden the system any more than making parole available to him in the first place would burden it. Parole is, in the end, a money saving measure to the state when compared to full incarceration. *Felce*, 974 F.2d at 1500.

The last *Turner* factor asks courts to gauge the reasonableness of a regulation by determining if there is an absence of ready alternatives. *Turner*, 482 U.S. at 90-91. As an alternative to the blanket parole condition prohibiting contact with a parolee's own children,

David asks for an individualized determination as to whether he poses a risk to his children. There is no evidence of any increased costs associated with providing such a determination. Although there surely are *some* costs associated with providing an individualized assessment of the harm David poses, the marginal cost is low. This is because, as discussed above, there are already resources in place to evaluate and monitor David and other parolees. Every state already must comply with *Morrissey* and provide due process hearings to parolees prior to revoking parole. Similar structures could be utilized in this case without much additional burden to the state. *See also Wolff v. McDonnell,* 418 U.S. 539 (1974) (requiring full due process hearing before good time credits are revoked).

In sum, David has a protected liberty interest which arises both from Indiana state law, which has a mandatory parole regime, and from the constitution itself. By any measure, the blanket parole condition imposed on David (and all sex offenders) banning him from all contact with his own children, is a drastic one, and it impinges on his liberty interest. The question then becomes what process must the state give him before it takes that liberty interest away. I turn to that question next.

2. *What Process is Due?*

Under *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), there are three questions to examine when determining what process is required to protect a liberty interest: (1) the private interest that will be affected by the action, (2) the risk of erroneous deprivation through the procedure used and the probable value of additional or substitute procedural safeguards, and (3) the Government's interest, including the function involved and the fiscal and administrative

burdens of additional or substitute procedures.  I recognize that many of these questions overlap

with the *Turner* factors. But since it is the approach taken by *Felce,* I too will follow that course.

As for the first *Matthews* question, David's private interest in being with his children is

significant, just as the plaintiff's interest in *Felce* in not being drugged was also "significant."

*Felce*, 974 F.2d at 1497.  As discussed above, the right to family relations is an important one

and one which "[t]he Supreme Court has long recognized as a component of substantive due

process." *Brokaw v. Mercer Cty.*, 235 F.3d 1000, 1018 (7th Cir. 2000)(citing *Prince v.*

*Massachusetts,* 321 U.S. 158, 166 (1944); *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923);

*Santosky v. Kramer,* 455 U.S. 745, 753 (1982).  *See also Lehr v. Robertson*, 463 U.S. 248, 261

(1983); *Russ v. Watts*, 414 F.3d 783, 789 (7th Cir. 2005); *Doe v. Heck*, 327 F.3d 492, 522 (7th Cir.

2003).

Although "freedom of association is among the rights least compatible with

incarceration," *Overton*, 549 U.S. at 131, the same cannot be said of parole.  A parolee's

"condition is very different from that of confinement in a prison," precisely because of his

interest in pursuing the "enduring attachments of normal life."  *Morrissey* 408 U.S. at 482.  The

re-establishment of the familial relationship is one of the prime examples of substantive freedom

that a parolee enjoys upon achieving his new status.  *Id.*  For someone like David Bleeke, who

for all appearances has a loving wife and family waiting for him to join them, this is very much

the ***whole point*** of parole. Without the ability to foster or even participate in this relationship, the

"liberty" provided by parole may be considered a mostly hollow shell.

The next *Matthews* factor is the risk of erroneous deprivation through the procedure used.

*Matthews*, 424 U.S. at 335.  The defendants in this matter have offered essentially no procedural

protections before imposing the no-contact-with-children condition. And it is certainly less than the procedures offered in *Felce* where the defendants at least relied on a "thorough review" of the plaintiff's prison and medical records, communications with his family, prior parole reports and the psychiatric findings based on two individual examinations. *Felce*, 974 F.2d at 1497. But this process was deficient because the psychiatrist and parole agents who arrived at the decision to condition Felce's parole on antipsychotic drugs were "insufficiently neutral and independent to guard against an erroneous determination." *Id*. at 1498.

There was also a grievance procedure available in *Felce* wherein the parolee could file a complaint against his parole agent, and have that complaint reviewed by several layers of management in the parole system. *Id*. at 1498-99. The Court found this procedural safeguard lacking because the administrator's decision was non-appealable, the process was all done in writing, there was only minimal opportunity for the parolee to present his case, and because there was no opportunity for an independent or neutral decisionmaker to pass judgment. *Id*.

In contrast to the "thorough review" given to the plaintiff in *Felce,* David was subjected to the sweeping parole condition preventing him from being with his children without any semblance of an individual assessment as to the risks he posed to those children. He was simply given the "off-the-rack" conditions provided for all sex offenders, regardless of whether the underlying crime involved children at all. David did not even have available to him the faulty grievance procedure provided by the *Felce* defendants to challenge the parole condition at issue.

While it is true that at the preliminary injunction hearing Defendant Vanlandingham, David's parole agent, hinted that there is some sort of procedure in place for parolees to gain an exception to the no-contact-with-children condition, her position wavered greatly on the witness

stand.  In the end, she was not a very credible witness with respect to her knowledge of these procedures, and it is frankly unclear whether the exception process she generally described was in reference to challenges to parole conditions, to requests for continuing visitation plans, or to individual visitation requests.  What Vanlandingham was clear about was the fact that David would not be eligible for *any* supervised ongoing visitation for at least a year after commencing parole.

Defendants did produce documentation that generally described the steps to be completed prior to an offender's obtaining an exemption from the rule precluding child visitations.  *See* 11/20/09 Hearing, Ex. C.  According to the guidelines, the offender must create a written request identifying the reason for the contact, the location of the visit and the proposed visitation supervisor.[2]  The visit must be approved by the supervising parole agent, the containment team, and the district supervisor.  Only then may it be submitted to the Parole Board.  Even if the offender obtains parole board approval, he still may not be alone with the minor and may not touch the minor.  In any event, whatever avenues of visitation relief are provided by these procedures, they are clearly subject to the discretion of David's parole agents, and not an independent decision-making body.

The Bleekes tried to demonstrate to Vanlandingham that David posed no harm to his kids, but she summarily dismissed them.  For example, David's mother and brother offered to be visitation monitors.  But they were blithely rejected by Vanlandingham who told David's mother and brother the following:  "What would I say to the people of Ohio if something happened and I

---

[2]Visitation supervisors must be provided for by the offender and must believe in the guilt of the person being monitored.  David was told by Vanlandingham that his proposed monitors for an individual visit, his mother and brother, would not be approved because they did not maintain a belief that he was guilty of his underlying crime.

had sent a child molester there?" (Melissa and the children reside in Ohio). Ms. Vanlandingham did not deny making this statement but didn't remember saying it either. There are a number of troubling things about this, not the least of which is that David has *never* been convicted or accused of child molestation or any sexual offense concerning children. In any event, Vanlandingham's statement shows an exaggerated response by the parole officer and also shows how the procedures in place can lead to confusion amongst the state's agents as to what risks they are actually guarding against. So David's own case provides an example of how the current process – if one could even call it a "process" – risks erroneous deprivation of his constitutional right.

The procedures employed by Defendants before imposing the parole guideline at issue here were far from the "thorough review" that did not even pass muster in *Felce*, nor did it provide for an "independent and neutral" decision maker. The only relief available to David, narrowly constrained supervised visitation, was contingent on approval by his parole agent and then other containment team members before even being presented to the parole board. Ongoing supervision was not permitted for at least the first year of parole, no matter what his parole agent recommended. And to make matters worse, the hoops he must jump through to obtain these limited visitations are plainly crafted for him as if he is a child molester, and the same guidelines provide no ability to disprove that assumption. The procedures as a whole create the very real risk that an individual who presents no threat to children, and never having been accused of creating such a threat, will be deprived of his right to familial association during the term of his mandatory parole.

Defendants argue that David is entitled to no further protections under the due process clause, because he was already provided with those protections during the trial and conviction for his sex offense crime.  This argument borders on frivolous, and cannot be squared with *Wilkinson*.  If the process afforded to prisoners during their trial was inherently enough to protect them from future abuses from parole administrators, the Supreme Court would not have allowed the *Wilkinson* plaintiffs to pursue their § 1983 claims seeking parole-eligibility hearings. *Wilkinson*, 544 U.S. at 77, 85.  Similarly, the Seventh Circuit's earlier *Felce* opinion would make little sense if the fact of conviction extinguished all of the prisoner's liberty interests and subjected him to the prison administrators' whims.  Instead, a balancing of the state's interests with those of the prisoner is necessary to determine what procedural protections are due. Where the balance weighs heavily in the prisoner's favor, as it does in this case, post-trial procedural safeguards are necessary before the state can take the drastic action it took here.

The second *Matthews* prong also requires that I consider the "probable value, if any, of additional . . . procedural safeguards[.]"  *Matthews*, 424 U.S. at 335.   In this case, an individualized determination of dangerousness would allow for weeding out individuals who truly pose a risk to their own children from those who do not.  It would also allow for appropriate narrowing of David's parole conditions so that they are not so invasive towards his right to familial integrity.  A hearing body could determine, for example, that David may live with his family after an approved period of supervised visitation or that he could begin with regular telephone communications.  The process would allow David to present evidence as to why he is not a risk to children.  It would also let the decision-maker take into account, when crafting the parole conditions, not only the state's interest in protecting his children, but also its

interest in incorporating David back into the community. And it could do so on an individualized basis as opposed to with the use of blanket rules.

The final *Mathews* factor that I need to evaluate is the fiscal and administrative burdens of requiring additional procedures. As discussed, the costs to the state of an individualized determination appears to be minimal, especially given the infrastructure already in place to provide parolees with certain other forms of due process procedures, such as revocation hearings, and the people in place charged with assessing the individual's risks and needs, such as parole agents, containment teams, and parole boards. The state similarly already stands ready to comply with the requirements of *Wolff* with respect to disciplinary hearings. If those resources do not provide sufficient means allowing the Defendants to make an individualized assessment of David, there are also mechanisms in place from the state's child welfare agencies. Outside of the criminal setting, a parent's rights can be terminated by the state only after complying with rigorous due process demands. "Parental rights cannot be denied without an 'opportunity for them to be heard at a meaningful time and in a meaningful manner.'" *Brokaw v. Mercer,* 235 F.3d at 1020*, (*quoting *Mathews,* 424 U.S. at 333)(internal quotations omitted). So there are a wealth of tools at the state's disposal for assessing an individual's parental risks.

To be sure, the Defendants offered no evidence at the hearing, and presented no arguments in their briefing, regarding the costs associated with making an individualized determination of the need for such a draconian parole condition. It appears to me that requiring a specific evaluation of the danger David poses represents an easy-to-implement alternative to the current system which reflexively cuts off David's fundamental rights to be with his children without a determination that such a condition is even necessary.

The Defendants argue that *Conn. Dept of Public Safety v. Doe*, 538 U.S. 1 (2003), means that no due process hearing is required. In that case, a sex offender challenged Connecticut's sex offender registration law, arguing he was entitled to a hearing before being forced to register. *Id.* at 6-7. The Supreme Court held that a sex offender was not entitled to a hearing giving him the chance to disprove his danger to others because the sex offender registration statute at issue was not dependent on whether the sex offender was currently dangerous or not. *Id.* But the plaintiff in *Doe* "expressly disavowed" any reliance on a fundamental liberty interest that was in need of protecting. *Id.* at 8. Not so for David, whose liberty interest in associating with his own children is squarely at issue.

*Doe* is also inapplicable because it involved a state statute which took away any discretion from the parole board as to whether a convicted sex offender must register. So there was no point to having a hearing since there were no facts to prove or disprove. *Id.* at 7 ("[T]he law's requirements turn on an offender's conviction alone."). Although Indiana law does place certain mandatory requirements on a sex offender's parole conditions, such as registration with a local enforcement authority and the prohibition of residing within 1000 feet of school property, the same statute says that the parole board "***may require***" a parolee to avoid contact with minors. *Compare* Ind. Code § 11-13-3-4(g)(2) *with* § 11-13-3-4(g)(1). Furthermore, the statute allows the parole board to create additional conditions but they "must be reasonably related to the parolee's successful reintegration into the community and not unduly restrictive of a fundamental right." Ind Code § 11-13-3-4(b). Thus, unlike in *Doe* where the fact of conviction as a sex offender was all that was needed to trigger the registration requirement, there are facts to prove or disprove related to the condition challenged by the Bleekes. *See accord*, *Jennings v.*

*Owens*, 585 F.Supp.2d 881, 890 (W.D.Tex. 2008)(finding *Doe* did not preclude a procedural due process claim arising out of parole conditions requiring parolee to refrain from entering relationships with anyone who has a minor child).

After evaluating all of the *Mathews* factors, I conclude that Defendants must provide further procedural protections to David before permanently imposing the conditions on his parole which prevent him from in any way associating with his children. An individualized determination as to the risks he poses to his own children must be made by an independent decision-maker before the state can impose the parole condition of preventing him from contacting his children.

\* \* \*

Neither party devoted very much space in their briefing or oral arguments to the specific remedy required in the event of a successful procedural due process claim. Defendants argued that David's trial provided adequate due process and left it at that. Plaintiffs argued that the current measures are inadequate, but did not identify what specific procedures should be set in their place. As a result, David's motion for preliminary injunction will be granted, but further briefing is in order to better determine the proper injunctive relief.

To be clear, the awarding of relief in this case is done with the knowledge that "[t]he procedural protections required by the Due Process Clause must be determined with reference to the rights and interests at stake in the particular case." *Harper*, 494 U.S. at 229. By no means should this opinion be read to support the notion that every single parole condition must be screened through a full due process hearing. Under the facts presented by this case, a parolee's fundamental interest in being with his children was blocked by the defendants' mandatory parole

conditions. A case with less significant a liberty interest, or parole conditions that did not so comprehensively seek to impede it, would not justify court interference under the Constitution.

## CONCLUSION

For the aforementioned reasons, Defendants' Motion to Dismiss [DE 16] is **GRANTED in part.** All of the Bleekes' claims but for their procedural due process claim are **DISMISSED without prejudice.** For the procedural due process claim, the Bleekes' Motion for Preliminary Injunction [DE 6] will be **GRANTED** because of the Bleekes' likelihood of success on the merits and the risk of irreparable harm that weighs strongly in the Bleekes' favor after balancing both sides' interests. The Bleekes have established that Defendants had a constitutional obligation to provide some procedural safeguard allowing for an individualized determination as to David's risk to his own children before imposing David's parole conditions. However, the specific terms of the injunction, as required by Federal Rule of Civil Procedure 65, will be stated in a further order of the court after the additional briefing is filed.

The parties are each **ORDERED** to file by **February 1, 2010** proposed procedures that will comply with the constitutional requirements as discussed in this opinion. The parties shall then file objections to those proposed procedures by **February 10, 2010**.

**SO ORDERED.**

ENTERED:    January __19__, 2010.

s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT